IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

UNITED STATES

v.                                          CAUSE NO. 3:19-cr-60-DCB-FKB

XAVIER D. COOPER                                              DEFENDANT

ORDER DENYING MOTION TO SURPRESS EVIDENCE

This matter is before the Court on Defendant Xavier D. Cooper ("Cooper")'s Motion to Suppress Evidence as Fruit of an Illegal Stop [ECF No. 26](the "Motion").  The Court held a hearing on August 25, 2020, during which the Court heard arguments from both parties and testimony from the Government's witness.  At the close of the hearing, the Court requested supplemental briefing from the parties regarding whether the traffic stop was proper under Fourth Amendment search and seizure law given the timing of (i) the traffic stop; and (2) when the arresting officers received confirmation of Cooper's license tag violation.  Having reviewed the Motion, response thereto, the parties' supplemental briefs, the hearing transcript and documents entered into evidence at the hearing, applicable statutory and case law, and being otherwise fully informed of the premises, the Court finds as follows:

1

Background

On the evening of May 22, 2017, while on a routine patrol in Hinds County, Mississippi, Officers Manor[1] and Trussell of the Clinton Police Department ("CPD") received a be-on-the-lookout alert ("BOLO") for a yellow Camaro.  Hearing Transcript [ECF No. 31-1] ("Tr.") at 11.  CPD disseminated the BOLO in connection with prior armed robberies or burglaries of gas stations in the Clinton area, which had put employees on high alert.  CPD Incident Report No. 17-00013629-001, Govt.'s Hearing Ex. G-1 at 15.[2]  The yellow Camaro had been seen at or around the time of one of the burglaries through video surveillance and was spotted again at two of the burglarized stations on May 22, 2017.  Tr. at 10; Ex. G-1 at 7. Two different named individuals who worked at the burglarized gas stations reported information regarding the suspicious vehicle to CPD on May 22, 2017.  Ex. G-1 at 7,  Exs. G-3 & G-4.  The operator of the Shell station on Northside Drive at Briars Drive in Hinds County called CPD around 8:15 p.m. on May 22, 2017 to report that

---

[1] At the time of the hearing, Officer Manor had been promoted to Sergeant. Tr. at 8.  To avoid confusion, he will be referred to as "Officer" throughout this Order.

[2] The document admitted into evidence as Government's Hearing Exhibit G-1 also can be found at ECF No. 28-1.  The Government introduced four exhibits into evidence at the Motion hearing. The Court admitted all four exhibits into evidence, without objection from the defense.  See Tr. at 4-6.  The hearing exhibits will be referred to in this Order as Exs. G-1 through G-4.

he had information about a suspect in the burglary of his station. Exs. G-3 & G-4.  He asked that a police officer come by the Shell station.  Id.  Around the same time, the operator of the Quik Stop on Northside Drive and Cynthia Street in Hinds County spoke directly with the investigating detective, Frank Pennell, about the sighting.  Ex. G-3.  Shortly thereafter, CPD dispatch called Detective Pennell to advise him of the call from the Shell station operator.  Id. Detective Pennell confirmed that he already was aware of the vehicle sighting because he had just spoken with the Quik Stop operator.  Id.  He further confirmed that he knew the full names[3] of both operators who reported the information, and he instructed dispatch to have the vehicle stopped and its occupants identified if there were any further sightings.  Exs. G-3 & G-4.

Around 10:00 p.m., within two hours of CPD receiving the report on which the BOLO was based, Officers Manor and Trussell spotted a yellow Chevrolet Camaro that matched the description of the suspicious vehicle.  Tr. at 11.  They saw the vehicle within one mile of one of the robbed gas stations.  Id.  Officer Manor testified that it was the only yellow Camaro that he saw in the area that night and that "[y]ellow Camaros kind of stand out."  Id.  The officers followed the vehicle and Officer Manor relayed

---

[3] These names are contained in the Government's exhibits that were admitted into evidence at the hearing. Exs. G-3 & G-4.

the license tag information to CPD dispatch so that the plate could be run. Id.; Ex. G-2.[4]

According to the hearing testimony of Officer Manor on cross-examination, the following sequence of events next occurred:

> Defense Counsel:  And did you turn on your blue lights prior to getting the result back for the tag?
>
> Officer Manor: Yes. When I initiated the traffic stop, most likely, is when the first information is given, and that's the incident date and time.
>
> Defense Counsel: Okay. So you had turned on your blue lights. You called in to dispatch the tag. Dispatch came back. And that's when the car pulled over, and you got out and proceeded with the traffic stop?
>
> Officer Manor: Yes.

Tr. at 17-18.

The tag results received from dispatch confirmed that the license plate was for a 2008 silver Dodge, not a yellow Chevrolet Camaro.  Ex. G-1 at 7; Ex. G-2 at 1.  Based on his training and experience, Officer Manor knew that the mismatched tag information meant that the license plate had been switched.  Tr. at 12.[5]  The

---

[4] The document admitted into evidence as Government's Hearing Exhibit G-2 also can be found at ECF No. 28-2.

[5] Operating a vehicle on Mississippi highways with a license tag that was issued for another vehicle is a violation of Mississippi law.  Miss. Code Ann. § 27-19-131.

Camaro came to a stop after the officers received the tag information. Tr. at 12, 15, 17-18, & 21.[6]

The officers got out of their patrol car and approached the Camaro. Ex. G-1 at 7, 11, 15. While at the driver's window, Officer Manor smelled marijuana. He asked Cooper to exit the vehicle and then asked for Cooper's driver's license. Ex. G-1 at 7. Cooper told Officer Manor that his license was suspended. Ex. G-1 at 7,11. A search of Cooper's Mississippi Identification Number confirmed that Cooper's driver license was suspended and revealed an active warrant for his arrest through Hinds County. Ex. G-1 at 7. Officer Manor conducted a search of the vehicle and discovered a backpack in the trunk that contained a Draco AK-47 assault rifle (serial number DA-9502-16 RO), screwdriver, large utility knife, gloves, sunglasses, and a respirator type mask. Ex. G-1 at 7&15. The officers then took Cooper into custody and transported him to the Clinton City jail. Id.

---

[6] In his Motion, Cooper contradicts Officer Manor's testimony and alleges that the officers did not run his license tag until after he had stopped his car, exited the vehicle, and was standing behind it. Motion at 2. Defense counsel states in the Motion that she was unable to have the defendant sign an Unsworn Declaration Under Penalty of Perjury under 28 U.S.C. § 1746 attesting to his allegations because of the Covid-19 pandemic. Regarding the timing of when the license tag was run, the Court finds the hearing testimony of Officer Manor to be credible. This testimony is further supported by the precise computer-generated time stamps in the Computer Aided Dispatch ("CAD") Log dated May 22, 2017, which show exact times down to the second. Ex. G-2 at 1.

Legal Analysis and Discussion

The Fourth Amendment provides that "[t]he right of the people to be sure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  When there is a Fourth Amendment violation, the exclusionary rule provides the remedy by suppressing evidence uncovered as a direct result of the violation, as well as evidence indirectly derived from the violation, at trial.  United States v. Mendez, 885 F.3d 899, 909 (5th Cir. 2018).

A traffic stop is considered a seizure within the meaning of the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653 (1979). The Fifth Circuit analyzes the constitutionality of a traffic stop under the standard articulated in Terry v. Ohio, which asks "whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Demouchet, Cr.No. 16-26, 2016 WL 7331562, at *11 (M.D. La. Dec. 16, 2016) (quoting Terry, 392 U.S. 1, 19-20 (1968)); see also United States v. Jenson, 462 F.3d 399, 402 (5th Cir. 2006).  "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, has occurred, or is about to occur, before stopping the vehicle."

6

United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2001) (citing United States v. Breeland, 53 F.3d 100, 102 (5th Cir. 1995)). "Reasonable suspicion need not rise to the level of probable cause." Lopez- Moreno, 420 F.3d at 430 (citing United States v. Arvizu, 534 U.S. 266, 274 (2002)).

In making reasonable suspicion determinations, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (internal quotation marks and citation omitted). The detaining officer must be able to "point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006). Officers are permitted to draw on their own experience and specialized training to make inferences about the cumulative information before them. Id. at 632. That cumulative information which the officer finds of value may elude an untrained person. Id.

Reasonable Suspicion Based on Witness Reports

Cooper argues that the stop was based solely on the two tips from gas station employees regarding a suspicious yellow Camaro and is insufficient to establish reasonable suspicion. Cooper challenges the basis for the stop itself; that is, the first prong of the Terry test. Motion at 3-4; Defense's Response to Order and

7

Supplemental Briefing [ECF No. 31]("Def. Supp.") at 8-12. Cooper does not challenge the events that occurred after the stop. In contrast, the Government asserts that the officers were justified in stopping the yellow Chevrolet Camaro because the BOLO was based on reliable reports of suspicious activity that CPD received from readily identifiable sources at two different gas stations, both of which had recently been robbed. Government's Response in Opposition to the Motion [ECF No. 28]("Govt. Opposition") at 4-5; Government's Response to Order and Supplemental Briefing [ECF No. 30]("Govt. Supp.") at 4-5.

"'[A]n alert or BOLO report may provide the reasonable suspicion to justify an investigatory stop.'" United States v. Rodriguez, 564 F.3d 735, 742 (5th Cir. 2009) (quoting United States v. Gonzalez, 190 F.3d 668, 672 (5th Cir. 1999)). The determination regarding whether a tip or BOLO provides a sufficient basis for an investigatory stop "may depend upon [1] the credibility and reliability of the informant, [2] the specificity of the information contained in the tip or report, [3] the extent to which the information in the tip or report can be verified by officers in the field, and [4] whether the tip or report concerns active or recent activity, or has instead gone stale." Id. This four-part test has been referred to in our precedent as the Gonzalez factors. Rodriguez, 564 F.2d at 742. Both parties agree in their briefs that this is the test to be applied in this case. Motion at 3;

Govt. Opposition at 4.  However, Cooper argues that none of the four Gonzalez factors is satisfied, Motion at 4, and the Government asserts that all four Gonzalez factors are met on the facts of this case.  Govt. Opposition at 5.  The Court will review each Gonzalez factor in light of the evidence and law:

1. Credibility and reliability of the informant:  Cooper erroneously states in his briefs that the identity of the "purported owner" of the gas station who provided the information to CPD is not known.  Motion at 3-4; Def. Supp. at 9.  However, evidence admitted at the hearing indicates that, not only were the sources of the information known to be linked to the earlier robbed gas stations, but the detective in charge of the investigation knew each of the sources by name.  Ex. G-3.  Further, CPD dispatch provided the full name of the caller from the Shell station in its "Closed Incident Report" dated May 22, 2017 at 8:15 p.m. (i.e., 20:15:14).  Ex. G-4.  In addition, Officer Manor testified that he knew that the BOLO was based on information received from the owner or manager of the "Shell station on Northside Drive at Briars Drive."  Tr. at 10-11.  This was not an anonymous tip; rather, it was information reported from business persons working in the community, who were identified by name and were themselves victims of the

9

crimes. Their standing in the community as parties interested in reporting suspicious activity, solving past crimes that affected them and their businesses personally, and stopping further gas station crimes lends weight to the credibility of their reports of suspicious activities in their parking lots. The evidence presented in this case leads the Court to find these sources and their corroborated observations to be reliable and credible. The first Gonzalez factor is met.

2. Specificity of the information contained in the tip or report: Although we do not have the exact text of the BOLO that CPD disseminated on the night of May 22, 2017, the Court nonetheless finds the testimony of Officer Manor at the hearing to be credible regarding the tip or report that CPD received from the Shell station operator. Following instructions from CPD, Officer Manor knew to be on the lookout for a yellow Chevrolet Camaro, a "stand out" vehicle in the area. Tr. at 10-11. He knew that that a yellow Chevrolet Camaro had been seen on video surveillance at or around the time of one of the gas station burglaries. Tr. at 10. Officer Manor testified that the information in the BOLO regarding the vehicle came around 8:00 that night from the owner or manager of the burglarized Shell station at Northside Drive and Briars Drive. Tr. at 10-11; see also

10

Closed Incident Report, Ex. G-4 (confirming Officer Manor's testimony).  In his cross-examination testimony, Officer Manor identified Detective Frank Pennell as the investigator who had talked with CPD dispatch that night regarding the information in the BOLO.  Tr. at 19; see also Ex. G-3. Based on the victims' reports of new sightings of the yellow Camaro at their places of business, Detective Pennell was sufficiently satisfied with the new information that he ordered dispatch to have the vehicle stopped and its occupants identified if further sightings occurred.  Exs. G-3 & G-4.[7]  About two hours later, Officer Manor spotted a yellow Chevrolet Camaro, the only one that he saw that night, which matched the description in the BOLO and was located within one mile of one of the robbed gas stations. Tr. at 11.

This situation is similar to that faced by the court in United States v. Reed, Cr. No. 6:15-cr-00113, 2015 WL 10739299 (W.D. La. Dec. 28, 2015)(report and recommendation adopted by district court at 2016 WL 1704402 (April 26, 2016)).  In Reed, the police received information describing

---

[7] Detective Pennell's knowledge of the specific reports and details may be imputed to Officers Manor and Trussell under the collective knowledge doctrine.  See United States v. Carmenate, 344 Fed. Appx. 941 (5th Cir. 2009) (collective knowledge supported reasonable suspicion for traffic stop).

11

a red truck seen near the Family Dollar on the night of the robbery, which came from two reliable sources – an eye witness who called in a report to the police and surveillance videotapes from a local business.  The information described the red color of the truck and gave identifying details such as chrome rims, headlights, and the existence of a front license plate (but not the tag number).  The police did not have the truck's make or model.  Eight days after the robbery, police officers observed the defendant driving a red truck that met the description of the vehicle suspected to have been used in the crime.  The court concluded that this gave the officers reasonable suspicion that the defendant might be connected to the crime, and "the officers were justified in asking some general questions, including whether there was a weapon in the truck."  Id. at *6.

    Here, the police had eye-witness reports from the victims of the gas station robberies who identified a distinctive yellow Chevrolet Camaro (a less than common vehicle in the area), video surveillance of the Camaro taken at or around the time of one of the robberies, subsequent sightings of the yellow Camaro at the same burglarized gas stations as reported by two named and identified owner/operators, and the direct involvement of the detective

12

in charge of the investigation in reviewing and assessing the information received. Officers Manor and Trussell acted upon sufficiently specific information to satisfy the second Gonzalez factor.

3. **Extent to which the information in the tip or report can be verified by officers in the field**: Officer Manor knew the source of the information contained in the BOLO (i.e., the owner or manager of the Shell station), and he knew the exact location of that gas station. Tr. at 10. He testified that the officers were within one mile of a robbed gas station when he saw the yellow Camaro traveling on Berkshire Street. Tr. at 11. Because of their proximity to the site of the crime, the police officers in the field could verify, if need be, the information directly and in person with the Shell station owner/manager. In addition, knowing that Detective Pennell was in charge of the investigation, the officers could verify the information about the robberies with a call to Detective Pennell, who already had spoken directly with one of the gas station operators. The third Gonzalez factor is met.

4. **Whether the information in the report has gone stale**: According to the testimony of Officer Manor, which the Court found to be credible, the report that the BOLO was based on was made around 8:00 p.m. on May 22, 2017, and the stop

occurred within about two hours at approximately 10:00 p.m. This testimony is supported by documentation admitted into evidence at the hearing. See Exs. G-3 & G-4. The report had not gone stale, and the fourth Gonzalez factor was met.

This Court is satisfied that the four Gonzalez factors have been met based on the evidence presented and the totality of the circumstances in this case. Accordingly, the Court finds that the information regarding the yellow Camaro that was provided to CPD by the victims of the crimes and video surveillance gave Officers Manor and Trussell the reasonable suspicion necessary to conduct a Terry stop of Cooper's vehicle on May 22, 2017.

Reasonable Suspicion Based on the Switched License Tag

Cooper does not dispute that he was driving the yellow Camaro with a mismatched tag in violation of Mississippi law. Section 27-19-131(2) of the Mississippi Code states: "Any ... operator ... who shall operate ... upon the highways of this state, without having paid the privilege license tax or fee required by the provisions of this article and who knowingly and intentionally ... displays a license tag or decal on the motor vehicle which was issued for another vehicle, shall upon conviction be fined not more than One Thousand Dollars ... or be imprisoned in the county jail not more than one (1) year, or both."

14

An officer's reasonable suspicion that there is a traffic violation — including a defect in a license tag — is an appropriate basis for stopping a vehicle.  See, e.g., Lopez-Moreno, 420 F.3d at 431 (non-functioning break light provided reasonable basis for stop); United States v. Smith, 355 F. Supp. 3d 544, 549 (N.D. Miss. Nov. 27, 2018), aff'd, 952 F.3d 642 (5th Cir. 2020) ("No party disputes that Solomon had reasonable suspicion to initially stop Smith for driving a vehicle without a visible tag."); see also United States v. Johns, Crim. No. 13-cr-00071, 2013 WL 4587744, at *4 (W.D. La. Aug. 27 2013) ("The combination of the BOLO and the unreadable (or altered) temporary license tag gave the officers reasonable suspicion to stop the vehicle."); United States v. Alfaro, Crim. No. 3:14-cr-97-TSL-LRA, 2014 WL 12670487(S.D. Miss. Dec. 4, 2014), aff'd, 638 Fed. Appx. 374 (5th Cir.2016)(obstructed tag provided reasonable basis for stop).

The Government argues that, because the vehicle's license plate violated Mississippi law, the police officers had an additional ground for stopping the vehicle, separate and distinct from the reasonable suspicion derived from the gas station reports. Cooper counters with a temporal argument and claims that the officers already had initiated the stop by turning on the patrol car's blue lights before they had the results of the license plate check.  Cooper asserts that there can be no reasonable suspicion based on the switched license plate because the officers had no

15

knowledge of the traffic violation when the stop began (i.e., when they turned on the blue lights).  The testimony of Officer Manor on cross-examination confirms that he turned on the blue lights before he had the license plate results in hand.  Tr. at 18.  Officer Manor further testified that he had the license plate results and knew the tag was switched before the yellow Camaro and the patrol car came to a stop.  Tr. at 20-21.

In its supplemental briefing, the Government points to cases that hold no seizure occurs when the police are continuing to pursue a suspect who has not yielded to a show of authority such as flashing lights.  Govt. Supp. at 3; see, e.g., Galas v. McKee, 801 F.2d 200, 203 (6th Cir. 1986).  Cooper argues that such cases are distinguishable from his actions because there is no evidence that he tried to flee after Officer Manor turned on the patrol car's blue lights.  Def. Supp. at 6-7.  Cooper further asserts that, because he submitted to the officers' show of authority by voluntarily pulling over to the side of the road, the seizure began while the patrol car and the Camaro were moving down the road, prior to confirmation of the tag violation and, consequently, without reasonable suspicion.  Id. at 4-6 (citing, e.g., United States v. Hill, 752 F.3d 1029 (5th Cir. 2014)).

Given that the Court has found, supra, that reasonable suspicion existed based on the information reported to CPD, an independent finding of reasonable suspicion based on the tag

violation is not essential to deny the defense's Motion. Nonetheless, the Court has considered the parties' arguments, reviewed the evidence and applicable law, and concludes that the violation of Mississippi law under Miss. Code Ann. § 27-19-131(2) creates an additional basis for a finding of the reasonable suspicion necessary to conduct a proper Terry stop.

On the issue of the timing of the commencement of the stop, the Court is guided by the United States Supreme Court opinion in Arizona v. Johnson, 555 U.S. 323 (2009). Writing for a unanimous Court, Justice Ginsburg instructed in Arizona that "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation." Id. at 333. This Court finds further guidance from the Fifth Circuit in United States v. Smith, 952 F.3d 642 (5th Cir. 2020). The unanimous panel in Smith wrote that "[a] Fourth Amendment 'seizure' occurs when an officer stops a vehicle and detains its occupants." Id. at 647. While the timing issue raised in this case could be considered a close call, this Court is mindful that the United States Supreme Court has made it clear that the constitutional reasonableness of a traffic stop does not hinge on "the actual motivations of the individual officers involved." Whren v. United States, 517 U.S. 806, 813 (1996). So long as police officers have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, has occurred, or is about to occur, the true

17

reason for which the officer initiated the seizure is irrelevant. Id.; see also Smith, 952 F.3d at 647; Lopez-Moreno, 420 F.3d at 430; Johns, 2013 WL 4587744, at 3 ("An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."). With that in mind, the question whether Officers Manor and Trussell decided to turn on the blue lights and subsequently pull the defendant over because of the information reported in the BOLO, or because they suspected a problem with the license tag, or both is less relevant. The evidence shows that, by the time the Camaro and the patrol car were pulled over and stopped, the police officers had in hand confirmation of Cooper's switched license plate in violation of Mississippi law, which opened yet another door to a permissible Terry stop.

Accordingly,

IT IS HEREBY ORDERED that Cooper's Motion to Suppress Evidence as Fruit of an Illegal Stop [ECF No. 26] is DENIED.

SO ORDERED, this the 1st day of October, 2020.

/s/ David Bramlette_____
UNITED STATES DISTRICT JUDGE